## Chicago & Alton R. R. Co. v. Jennie Du Bois, Administratrix of Wm. L. Du Bois.

1. MASTER AND SERVANT—*Duty of Master as to Machinery, etc.*—The intention of the law is that machinery or appliances provided by the master for the use of his employes, shall be as safe as ordinary care, prudence and skill can make it.

2. SAME—*Where the Master Manufactures the Machinery.*—If the master manufactures the machinery, the law imposes upon him the legal duty of exercising ordinary and reasonable care and diligence to produce a machine that will be safe for the use of the servant, and also charges him with the further duty of using the like degree of skill, care and diligence in keeping it in such repair that it will be safe.

3. SAME—*Master Not an Insurer.*—The master is not held as an insurer that the machinery is safe, or even reasonably so, but only that he has used reasonable care, skill and diligence to make and keep it safe.

4. SAME—*Notice of Defects in Machinery.*—A servant can not recover of his employer for any injury caused by a defect in machinery without showing that the master had knowledge or by the use of reasonable diligence might have had knowledge, of the defect.

5. JUDGES—*Improper Remarks.*—On the trial of an action for damages sustained by reason of the explosion of a boiler, counsel objected to a witness because he had not been shown to be an expert; the court said: "Experts, like all other witnesses, are only entitled to credit after they bring themselves within the rule, for what it amounts to; I would rather take some men's opinion on the subject than twenty experts after he brings himself within the rules. Then the question is what weight the jury will give to his opinion." *Held* that the remark improperly encroached upon the province of the jury.

6. INSTRUCTIONS—*Invading the Province of the Jury.*—An instruction which invades the province of the jury by assuming to advise them that if certain recited facts are proven, they are required by the rules of law to find that employes of a railroad company in constructing an engine did not discharge their duties with reasonable and ordinary skill and care, is improper.

**Memorandum.**—Action for damages; death from negligence in constructing machinery. In the Circuit Court of McLean County; the Hon. THOMAS F. TIPTON, Judge, presiding. Declaration in case; plea, not guilty; trial by jury; verdict for plaintiff: appeal by defendant. Heard in this court at the May term, 1894. Reversed and remanded. Opinion filed December 21, 1894.

WILLIAM BROWN and WILLIAMS & CAPEN, attorneys for appellant.

FRANK B. McKENNAN and T. C. KERRICK, attorneys for appellee.

MR. JUSTICE BOGGS DELIVERED THE OPINION OF THE COURT.

William L. Bu Bois, a locomotive engineer, was killed while in the employ of the appellant company by the explosion of the boiler of a locomotive engine, which he was operating on its railroad.

This was an action brought by his administratrix under the statute to recover the damages resulting from his death to his widow and next of kin.

Judgment in the sum of $5,000 was rendered against the company for which it has prosecuted this appeal.

The appellee rested the right of recovery upon two charges of negligence. (1) That certain servants of the company employed by it to construct the engine, negligently built the inside sides of the fire box of the boiler of the engine out of sheets of steel which had been damaged and deteriorated in point of thickness, strength and quality, and allowed to rust to such an extent as to render them unfit and insufficient for that purpose, and that such sheets or plates of steel by reason of the great heat to which they were afterward subjected and the alleged defects therein before mentioned, became cracked " in different places, so that though such cracks were repaired by 'plugging,' the sheets were greatly weakened and rendered insufficient to withstand the pressure of the steam, and that the explosion occurred in consequence thereof." (2) That a number of bolts called "stay bolts," designed to strengthen and hold the sides of the fire box of the boiler firmly in place, and to further enable the sheets of steel of which the box was composed to · resist the pressure of the steam upon them, had become and were broken at the time of the explosion, and that the explosion was caused thereby.

The theory of the appellee was that a sheet which composed the right hand inside side of the fire box gave way under the pressure of the steam and that the explosion was the result thereof.

The appellant company insisted that the explosion was not so caused, but that it was occasioned by the failure of the deceased to discharge his duties as engineer with reasonable skill and care in that he neglected to keep the boiler of the engine properly supplied with water, and that the explosion was caused by superheated steam generated in consequence of such neglect. The engineer, fireman and head brakeman were the only persons on the engine and all of them were killed.

The appellant company was forced to rely upon the testimony of expert witnesses to support its theory as to the cause of the explosion.

These witnesses examined the fragments of the boiler and coincided in the opinion that the explosion occurred because the boiler was insufficiently supplied with water.

They also testified that the appearance of the top sheet (called the crown sheet) of the fire box of the boiler indicated that it was red hot and bare of water when the explosion occurred, and that the initial point of the explosion was in the boiler just above the front part of this crown sheet and not at the side of the fire box, as appellee claimed.

The appellee sought to support her theory by the testimony of witnesses as to the construction of the engine and also by the opinion of witnesses who examined pieces of the engine after the explosion. The engine was built in 1889, by the appellant company in its shops at Bloomington. The explosion occurred February 2, 1892. While it is alleged in the fourth count of the declaration that the boiler was not, when constructed, furnished with a sufficient number of stay bolts, and that those that were furnished were placed too far apart, yet it is not contended by the appellee that the charge was sustained by the proof. The proof to the contrary was ample. The contention of the appellee as to the stay bolts now is that the fact that a number of them subsequently became broken, and by reason thereof the sides of the fire box of the boiler were not sufficiently supported, and that such bolts were broken, was, or by the exercise of ordinary care might have been, known to the appellant company. The appearance of pieces of broken bolts found after the explosion was relied upon to support the charge that a great number of them were broken at time of and before the explosion.

There was much conflicting testimony as to the appearance of these broken parts of the bolts and many variant opinions expressed by different witnesses who gave testimony as experts as to the proper conclusion to be drawn therefrom. Whether such bolts were broken before, or were broken by the explosion, was left in much doubt.

It is not improbable that some were broken before the boiler exploded, for it appeared in the evidence that such bolts are liable to break at any time when an engine is run-

ning upon the road and that for this reason every engine when built is supplied with an excess of bolts in order that it may be safe, though some are broken.   The rule adopted by boiler makers is to put in each engine a sufficient number of stay bolts to resist at least three times the pressure to which the boiler is to be subjected when the engine is in use.   That rule was observed in the construction of this engine.   As before said the company was not derelict in the matter of equipping the engine with stay bolts.

The intention of the law is that machinery or appliances provided by the master for the use of the employe shall be as safe as ordinary care, prudence and skill will make it.

If the master manufactures the machinery the law imposes upon him the legal duty of exercising ordinary and reasonable care and diligence to produce a machine that will be safe for the use of the servant, and also charges him with the further duty of using the like degree of skill, care and diligence in keeping it in such repair that it will continue to be safe.   Woods on Railroads, Vol. 3, Secs. 373–375; Shearman & Redfield on Negligence, Secs. 87–92; Weber Wagon Co. v. Kehl, 139 Ill. 644.

The master is not held as an insurer that the machinery is safe or even reasonably so, but only that he has used all reasonable care, skill and diligence to make and keep it safe.

" A servant can not recover of his employer for an injury caused by a defect in machinery, without showing that the master had knowledge, or by the use of reasonable diligence might have had knowledge of the defect." E. S. and Provision Co. v. Hightower, 92 Ill. 139.

Therefore, when the engine itself was completed and put in use upon the road, it became incumbent upon the appellant company to use reasonable care and diligence to have and keep it supplied with such a number of sound bolts that it would be safe from the dangers of explosion.

If it discharged that duty, liability to respond in damages to the appellee can not be predicated upon the charge of negligence in the matter of the stay bolts.

It appeared from the evidence that monthly inspection for broken stay bolts was deemed reasonably prudent and safe by boiler makers, engineers and others competent to speak from experience upon that question, and that examinations at such periods were a general rule and custom.

It further appeared from testimony that was not contradicted that one Matthew Owens, a boiler maker of forty years' experience, and his assistant, while in the discharge of their duties as employes of the appellant company, examined the engine in question for broken stay bolts not more than eight days before it exploded. Owens went into the boiler and with the aid of his assistant, who remained on the outside, subjected the bolts to the "hammer test," which is conceded to be the best test to ascertain if any bolts are broken. Owens testified that they completed the work, and when that was done "there was not a broken stay bolt in the boiler." No reason appeared for discrediting the competency of this witness to perform this work or his truthfulness as a witness. If his statements were not untrue, the appellant company was not legally chargeable with negligence in respect of its duty as to the stay bolts.

In proper time it required a competent and experienced workman and an assistant to subject the bolts to the best test known in order to discover if they were whole and sound. They discharged the task faithfully and to the best of their skill and judgment.

Nothing more could be required when only reasonable and ordinary prudence and care is demanded.

So it seems clear the judgment can not rest upon the charge that the explosion occurred because the company failed to discharge its duty with reference to the stay bolts of the engine.

If supported at all, it must be upon the ground that the company negligently built the inside side of the fire box out of rusted and insufficient and defective sheets of steel.

The appellee introduced but two witnesses, Jesse King and Christian Ayersman, who testified upon that point. The testimony of King, it may be conceded, was fully in support of the position of the appellee.

But Ayersman testified that he worked on the sheets of steel that went into the inside side of the fire-box and that they were of first class material. He stated that the " connection sheet " was made of a rusted sheet of steel, but insisted that it was not injured by the rust. As to the sheets used in making the inside sides of the fire-box he directly contradicted King.

Four witnesses, John M. Holland, foreman of appellant's force of boiler-makers, George Gregg, foreman of its shops, Arthur Hayes, forgeman, and Frederick Hayes, who hammered all the rivets and stay bolts in the boiler, were introduced in behalf of the appellant company. Holland testified that he selected the sheets of steel that were put into the sides of the' inside of the fire-box when the engine was built and 'worked them over inch by inch; marked out the places where holes for the stay bolts should be made; and that not a single defective sheet was used. Hayes testified that he went over all parts of each inside and outside sheet that went into the fire-box and riveted all the stay bolts; that he saw no sheet that was rusted and damaged, but all were in good condition. Gregg testified that he had charge of the construction of the engine; that he saw the sheets; saw them drilled for the stay bolts and that they all appeared to be in first class order; all first class sheets. Hughes testified that he saw the sheets before they went into the boiler and saw them " rolled " and put in shape and that they appeared to him to be perfect in every particular. These witnesses for the appellant, four in number, and Ayersman, a witness for the appellee, in all, five, directly contradicted King as to the character and quality of the sheets used in making the sides of the fire-box.

His means of knowing as to the particular matter about which they all testified, was not superior in any respect to theirs; and we are aware of no sufficient reason why his statement should have been given greater weight than that of five other witnesses. True, four of them were in the employ of the appellant company— the other, Ayersman, was not—but it was also true that King had been in its employ,

but he engaged in a strike in 1892 and the company refused to allow him to return into its service. Ayersman was not an employe of the appellant company, and the appellee introduced him in her behalf as a witness worthy of credit and entitled to be believed. We are unable to perceive why or upon what theory the jury were justified in giving greater weight to the testimony of King than to that of so many other witnesses. They may have been inclined to that end by an error which occurred in the course of the trial of the cause, which, for that reason, will now be noticed.

Jesse King, the witness in behalf of the appellee, to whom we have just referred, was proceeding to give his opinion to the jury as to the cause of the explosion, when counsel for the appellant company interposed an objection upon the ground that it had not been shown that he was competent to testify as an expert. The court said: "Let him tell, he is a boiler maker."

Counsel for appellant said: "This witness has not shown that he is an expert witness."

The court replied as follows:

"THE COURT: Experts, like all other witnesses, are only entitled to credit after they bring themselves in the rule, for what it amounts to; I would rather take some men's opinion on the subject than twenty experts, after he brings himself in the rule. Then the question is, what weight the jury will give to his opinion."

This remark carried to the jury the information that the court placed a low estimate upon the testimony of expert witnesses, and that it was the judgment of the court that the opinion of some men who were not experts, was entitled to more weight than the opinions of twenty who were. The court had immediately before declined to rule directly whether King was competent to testify as an expert, but directed that he could proceed to express his opinion. The inference likely to be drawn by the jury was that the opinion held by King was proper for their consideration, whether he could bring himself within the rule as an expert or not, and there is much reason to fear that

the jury would accept, as a necessary further inference, that King was one of the " some other men," whose opinion was, in the judgment of the court, entitled to as much or more weight than that of twenty experts.    The probable effect was not only to discredit, in advance, the expert witnesses subsequently introduced by the appellant in support of its defense, and to unduly enhance the opinion expressed by King as to the cause of the explosion, but a further possible effect was to impress the mind of the jury with the conclusion that the testimony of King as to the character and quality of the steel used in the fire box of the boiler ought to be accepted by them as entitled to more weight than the testimony of five other witnesses, who, as we have seen, testified in opposition to him on that question.

The credibility of witnesses and the weight to be given their testimony are matters exclusively for the judgment of the jury.    The remark of the court improperly encroached upon the province of the jury and may have entered into their deliberations and controlled their action.    That the cause of the appellant company may have been thereby greatly prejudiced, can not be denied.

The appellant company has complained that other errors intervened, but, in view of the fact that the matters complained of, except as to one hereafter noticed, are not likely to again occur, it seems to us only necessary that we should give attention to but that one of such alleged errors.

The court, at the request of the appellee, gave to the jury the following instruction :

" 6.    The court instructs you that if you believe from the evidence that the locomotive in question was constructed in the shops of the defendant, and that in the construction of the same, there was used by or with the knowledge and consent of defendant, or any of its officers or agents who had charge of the construction of said locomotive, steel plates that had been permitted to rust, and in consequence thereof to deteriorate in strength, whereby said plates became and were insufficient and improper to be used for the purpose aforesaid, and that afterward, in consequence of such defective plates, if the jury believe from the evi-

dence that they were defective, the said engine exploded, and by such explosion killed William L. Du Bois, husband of complainant, while he was exercising ordinary care for his own safety, then the jury should find. the issues for the plaintiff."

We have seen that the obligation imposed by law upon the appellant company was that in building the engine it should use reasonable and ordinary skill and care to make it safe for the use to which it was to be devoted and that a failure to exercise that degree of care constituted negligence in law. Whether such degree of care was used was a question of fact. The instruction invaded the province of the jury by assuming to advise them that if certain recited facts were proven they were required by the rules of law to find that the servants of the company who constructed the engine did not discharge their duties with reasonable and ordinary care or skill. The jury should have been advised as to the degree of skill and care demanded by law of the workmen who build the engine, and left free to determine from the facts disclosed by the evidence whether such workmen were negligent or not.

It was disclosed by the evidence that it was not uncommon to find rust upon pieces or sheets of iron or steel intended for use in building engines and other machinery, and that usually the metal was in no sense injured thereby. It was obviously the duty of those engaged in building the engine to examine the material they were about to use in order to ascertain that it was fit and sufficient for the purpose to which it was proposed to devote it. The law did not demand that they should reject a sheet of steel or bar of iron because rust was found upon it. The law had no rule about it. It only demanded that they should be competent to judge of the quality and fitness of the material, and should carefully inspect it and exercise reasonable skill, care and judgment to ascertain whether it was fit and sufficient to be used. If they were so competent, and did so proceed with the required degree of skill and care, they fulfilled the law and are not to be denounced as negligent, a consideration which escaped the notice of the court when passing upon this instruction.

If the instruction had declared that the workmen should be deemed negligent if it appeared that they used sheets of steel which they knew were deteriorated in strength and rendered insufficient from the effect of rust, it might have been sound as a proposition of fact, but it was unsound, both in law and fact, to declare them conclusively guilty of negligence if they used steel that had rust upon it and so affected it as to render it insufficient, for the reason that the controlling question whether the injury to the metal could have been discovered by the exercise of reasonable vigilance, care and skill is left wholly out of consideration.

In view of the errors of law we have pointed out, and the unsatisfactory condition of the evidence, we are driven to the conclusion that the motion of the appellant company for a new trial should have been sustained.

The judgment must be, and is, reversed and the cause remanded.